**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAMONT HAGAN,** | : | **Civil No. 1:13-CV-2731** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **RICHARD SOUTHERS, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

## I.   INTRODUCTION

This is an action brought by Damont Hagan, an inmate in the custody of the Pennsylvania Department of Corrections, currently housed at the State Correctional Institution, Greene.  The incidents complained of in this action are alleged to have occurred while Hagan was incarcerated at SCI-Smithfield.  Hagan originally brought this suit against a number of corrections officials and administrators at SCI-Smithfield and Secretary of the DOC, all of whom have since been dismissed from the litigation.  The lone remaining defendant is Quentin Dolphin, a psychiatrist who was contracted to provide medical services to inmates at SCI-Smithfield, and who provided such services to Hagan during his time at that facility.  Hagan alleges that Dr. Dolphin violated his constitutional rights by

exhibiting deliberate indifference to his serious mental health needs, by retaliating against Hagan for his exercise of rights guaranteed by the First Amendment to the United States Constitution, and by conspiring with others to violate Hagan's constitutional rights.  Hagan has since conceded that his claim for conspiracy lacks foundation and should be dismissed.  (Doc. 157, § III.)  Accordingly, the only claims remaining in this case concern deliberate indifference under the Eighth Amendment, and retaliation in violation of the First Amendment.

Dr. Dolphin has moved for summary judgment on these two remaining claims, and after the Court granted Hagan several extensions of time to respond, the motion is now fully briefed and ripe for disposition.  For the reasons that follow, the Court finds that Hagan's allegations regarding Dr. Dolphin's alleged deliberate indifference find no support in the record and are, in fact, thoroughly discredited by that record.  Likewise, the Court finds no evidence that could create a triable issue against the remaining defendant with respect to Hagan's First Amendment retaliation claim, since there is no evidence to show that Dr. Dolphin knew of or was influenced by Hagan's litigation activity, or that the care he provided could be considered adverse action necessary to support the claim. Accordingly, having reviewed the entire evidentiary record, and finding that it compels judgment in Dr. Dolphin's favor, the motion for summary judgment will be granted, and the case will be closed.

## II.   <u>BACKGROUND</u>

The factual background to this memorandum is taken from the defendant's statement of undisputed facts, to the extent that Hagan has not properly placed those facts in genuine dispute.  The Court has further reviewed the evidence in the record offered in support of those facts, and has endeavored to determine whether any of those facts are subject to legitimate dispute.  What that review has shown is that Hagan's subjective views regarding the medical and mental health treatment that he received find nearly no support in the record, whereas the objective record supports Dr. Dolphin's version of events and treatment decisions, which indicate that Hagan received regular and consistent professional medical care, and that the treatment decisions were appropriate given Hagan's medical and mental health needs at the time.  The evidence simply cannot be read to support a claim of deliberate indifference; instead, at most it shows that Hagan had a different point of view regarding his treatment needs.  As indicated below, there is no substantial evidence that could possibly support Hagan's conclusory assertion that Dr. Dolphin's medical decisions were undertaken in a retaliatory manner, and the record exclusively supports Dr. Dolphin's position that he would have rendered the same care to Hagan regardless of his ongoing campaign of filing grievances and complaints against prison staff.

Dr. Dolphin is a psychiatrist who is licensed to practice medicine in the Commonwealth of Pennsylvania, and delivers mental health services to inmates at SCI-Smithfield. (Def. SMF ¶ 1.) Dr. Dolphin began to treat Hagan in 2013. (*Id.* ¶ 2.) In that year, the DOC used a Mental Health Roster system intended to ensure that inmates with mental illnesses were appropriately identified and that they received treatment for their mental-health needs. (*Id.* ¶ 4.) Under this system, each inmate's status on the Mental Health Roster was communicated to other DOC staff through what are known as Stability Codes. (*Id.* ¶ 5.) These Stability Codes provide a progressive means of identifying inmates by group depending on the degree of mental health needs at issue. Thus, Stability Code "A" refers to an inmate with no serious mental health needs; Stability Code "B" refers to an inmate with a history of mental health needs; Stability Code "C" refers to an inmate with current mental health needs; and Stability Code "D" refers to inmates with the most serious need for mental health services. (*Id.* ¶ 6.) Inmates who were identified with Stability Codes "C" or "D" were placed on the Active Mental Health Roster. (*Id.* ¶ 7.)

Dr. Dolphin first began providing treatment to Damont Hagan on March 6, 2013. (*Id.* ¶ 2.) The record reflects that between April 2013 and November 2013, Dr. Dolphin assessed Hagan on multiple occasions. (*Id.* ¶ 10.) During this time, Dr. Dolphin authored numerous progress notes that summarized his assessments of

Hagan. (*Id.*)  In addition, the record reflects that aside from his treatment with Dr. Dolphin, Hagan had 14 mental health visits with a Psychological Services Specialist (PSS) between April 1, 2013 and November 20, 2013.  (*Id.* ¶¶ 10-11.) Far from being pro forma, these visits included assessments of suicidal ideation, behavior, appearance, grooming, feelings, insight, perceptions, thinking, memory, orientation and impairment.   Additionally, Dr. Dolphin and others prepared treatment notes, and documented plans for Hagan's treatment going forward.  The PSS also offered Hagan assistance with coping skills, exercises, workbooks and even with follow-up referrals to psychiatric services when warranted. (*Id.* at ¶¶ 12-13.)

The record is manifold with examples of the time and attention that medical professionals paid to Hagan.  On April 4, 2013, Dr. Dolphin saw Hagan, who told him that he believed he needed to go to a Mental Health Unit ("MHU"), even though Hagan denied having suicidal thoughts, and reported that he was not depressed or distressed.  (Def. SMF ¶ 14.)  Hagan was preliminarily diagnosed with having Antisocial Personality Disorder, but Dr. Dolphin's notes indicate that he was also concerned that Hagan was simply malingering.  (*Id.* ¶ 15.)  At that time, Dr. Dolphin increased Hagan's medications and made plans for further follow-up.  (*Id.* ¶ 16.).

On April 25, 2013, the Psychiatric Review Team drew up an Individual Treatment Plan for Hagan, identifying him with Stability Code "C" and diagnosing him with Antisocial Personality Disorder and Unspecified Psychosis. (*Id.* ¶17.) Dr. Dolphin saw Hagan for follow-up on June 25, 2013, and was accompanied during his visit by David Swisher, a Licensed Psychologist Manager. (*Id.* ¶ 18.) At this time the plaintiff continued to be diagnosed with Antisocial Personality Disorder, which had not changed from the plaintiff's initial assessment on April 4. (*Id.* ¶19.) During this visit, Hagan appeared to be stable, clean, alert, coherent, cogent and euthymic. (*Id.* ¶ 20.) Dr. Dolphin specifically noted that Hagan was focusing on being labeled as a mental health patient, and paid less attention or care to his actual symptoms or difficulties he claimed to be having. (*Id.* ¶ 21.) Notably, during this visit, Dr. Dolphin observed and commented that Hagan did not seem objectively different while taking antipsychotic medication than when he was not on the medication, and, therefore, Dr. Dolphin thought it was medically appropriate to have Hagan taper off his medication – something he discussed with Hagan. (*Id.* ¶ 22.)

One week after this meeting, the Psychiatric Review Team met and developed an Individual Treatment Plan for Hagan. During this meeting, the plaintiff's primary diagnosis remained unchanged, and he was still identified as a

Stability Code "C" inmate, and, therefore, continued to be kept on the Active Mental Health Roster. (*Id.* ¶¶24-25.)

One of the animating concerns for Hagan, and something that seems to have inspired his claims in this case and his abiding sense that prison and medical officials had a nefarious plot against him, centers around a tour of SCI-Smithfield by the United States Department of Justice that took place on August 7, 2013. Hagan seems to believe that medical professionals acted out of retaliatory animus in order to alter his mental health diagnosis and classification and have him removed from the Active Mental Health Roster so that he would not come into contact with DOJ representatives to whom he would have complained about prison conditions or other grievances. It appears that Hagan believes that his status was adjusted to remove him from the roster in advance of the DOJ tour, but the evidence simply does not support this assertion, since it is clear from the documentary evidence that Hagan's mental health Stability Code was not reduced to "B" from "C" until September 5, 2013, or nearly one month after the DOJ visit to the prison. (*Id.* ¶ 35.) That adjustment came after the mental health team discovered that Hagan was not taking his medications and yet appeared to be stable. (*Id.*)

On August 16, 2013, Hagan was brought to the medical room at SCI-Smithfield because it was alleged that he had recently cut himself. (*Id.* ¶ 28.) A

Psychological Services Assistant was present at the assessment, and at that time offered Hagan additional one-on-one time and mental health follow-up should he need it; Hagan simply needed to ask for it and it would be provided.  (*Id.*)  The record indicates that Hagan consented to this proposal.  (*Id.*)

Less than a week later, on August 22, 2013, the Psychiatric Review Team convened to review Hagan's treatment plan.  (*Id.* ¶ 29.)  During that time, as noted, Hagan remained on the Active Mental Health Roster with a Stability Code of "C".  (*Id.*)  In addition to Antisocial Personality Disorder, Hagan had been identified as having Narcissistic Personality Disorder.  (*Id.*)  Just five days later, Dr. Dolphin personally met with Hagan along with David Swisher, the Licensed Psychologist Manager.  (*Id.* ¶31.)  During that meeting, notes reflect that Hagan was clean, alert, coherent and pleasant.  (*Id.* ¶33.)  Hagan admitted to having some "unusual thoughts," and for that reason apparently believed that he suffered from mental health illness.  (*Id.* ¶ 32.)  Following this meeting, Hagan continued to be identified as having Antisocial Personality Disorder, and Dr. Dolphin scheduled Hagan to return to the clinic in 12 weeks so that he could be reassessed.  (*Id.* ¶34.)

Although he continued to be diagnosed with having Antisocial and Narcissistic Personality Disorders, on September 5, 2013, the plaintiff's Stability Code was reduced to "B".  (*Id.* ¶¶ 35-36.)

8

On October 2, 2013, Hagan expressed suicidal thoughts, and Dr. Dolphin immediately responded by ordering that Hagan be moved to the Psychiatric Observation Cell ("POC").  (*Id.* ¶ 37.)  Hagan was monitored in the POC by Dr. Dolphin and others for the next nine days, until October 11, 2013.  (*Id.* ¶¶ 38-43.) During that period, Dr. Dolphin personally saw the plaintiff on October 2, 3, 4, 7, 8, 10, and 11.  (*Id.*)  Based on his assessment over multiple days, Dr. Dolphin noted that Hagan seemed more upset with the staff in the Restricted Housing Unit where he had been held, rather than suffering any actual acute mental health issues. (*Id.* ¶ 39.)  Nevertheless, the plaintiff was permitted to remain in the POC temporarily, and after Hagan told Dr. Dolphin that he believed he needed more treatment, Dr. Dolphin had him transferred to a Mental Health Unit at SCI-Rockview – an order that was issued on October 11, 2013.  (*Id.* ¶ 42.)

Pursuant to Dr. Dolphin's order, Hagan was held in the Mental Health Unit at SCI-Rockview from October 11, 2013, until October 21, 2013.  (*Id.* ¶¶ 43-45.) On October 21 he was discharged with a continuation of his diagnosis with Antisocial Personality Disorder.   Notably, during this time, mental health professionals at SCI-Rockview were in touch with Dr. Dolphin to discuss Hagan's diagnoses and treatment.  These professionals concluded that Hagan did not have a true Axis I diagnosis, and upon his discharge from the Mental Health Unit, it was noted to be a "suicide gesture."  (*Id.* ¶ 45.)  Upon his return to SCI-Smithfield,

Hagan was initially returned to the Psychiatric Observation Cell, but was soon thereafter returned to the RHU upon recommendations of the Psychiatric Review Team. (*Id.* ¶ 46.) The same team met on October 30, 2013, to discuss a revised Individual Treatment Plan for the plaintiff, now noting that his Stability Code had been downgraded to "D". His diagnoses of Antisocial and Narcissistic Personality Disorders remained unchanged. (*Id.* ¶ 47.)

At this point, mental health professionals seemed to have developed greater skepticism about Hagan's mental health issues, and to be growing in their concern that he was malingering. Thus, on November 18, 2013, Hagan was treated by a different psychiatrist who noted that he could find no significant mental illness, and that his primary diagnosis was Antisocial Personality Disorder. This psychiatrist noted that Hagan was malingering to stay out of the RHU, and he confirmed his own view that Dr. Dolphin's treatment of Hagan had been appropriate. (*Id.* ¶ 48.)

Hagan continued to be seen by medical and mental health professionals throughout the fall of 2013. Thus, on November 20, 2013, Hagan was re-admitted into the POC by Dr. Dolphin, at which time he was seen by Dr. Dolphin and other practitioners. Hagan was discharged the following day after he indicated that he was not suicidal, and that he wished to return to his cell in the RHU. His diagnosis remained unchanged, as did his listing as "D" on the Mental Health Roster.

Subsequently, on December 9, 2013, Hagan was reclassified as a "C" on that roster. (*Id.* ¶ 49-52.)

Nothing in the medical records indicates, or otherwise supports Hagan's contention, that his medical care was tied in any way to his litigation activities.

## III.   <u>STANDARD OF REVIEW</u>

Rule 56(a) of the Federal Rules of Civil Procedure provides that judgment should be rendered if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Davis v. Mountaire Farms, Inc.*, 453 F.3d 554, 556 (3d Cir. 2006) (summary judgment appropriate only if there are no genuine issues of material fact).  In considering a motion for summary judgment, a court must view the evidence and draw all inferences in the light most favorable to the non-moving party, <u>*Id.*</u>, and may grant summary judgment only if no reasonable juror could find for the non-movant, *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist.  Further, "only evidence which is admissible at trial may be

considered in ruling on a motion for summary judgment." *Countryside Oil Co., Inc. v. Travelers Ins. Co.,* 928 F.Supp. 474, 482 (D.N.J. 1995).  This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact which would preclude summary judgment.  With respect to such claims, it is well-settled that:  "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." *Shelton v. University of Medicine & Dentistry of N.J.*, 223 F.3d 220, 223, n.2 (3d Cir. 2000), citing,  *Stelwagon Mfg. v. Tarmac Roofing Sys., Inc.,* 63 F.3d 1267, 1275, n.17 (3d Cir. 1995).  In this regard it has been aptly observed that

> It is clear that when considering a motion for summary judgement, a court may only consider evidence which is admissible at trial, and that a party can not rely on hearsay evidence when opposing a motion for summary judgment. *See Buttice v. G.D. Searle & Co.,* 938 F.Supp. 561 (E.D.Mo.1996).  Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay. *See Burgess v. Allstate Ins. Co.,* 334 F.Supp.2d 1351 (N.D.Ga.2003).  The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage. *Henry v. Colonial Baking Co. of Dothan,* 952 F.Supp. 744 (M.D.Ala.1996).

*Bouriez v. Carnegie Mellon Univ.*, No. 02-2104, 2005 WL 2106582,* 9 (W.D. Pa. Aug. 26, 2005).  Thus, a party may not rely upon inadmissible hearsay assertions

to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. *See, e.g., Synthes v. Globus Medical, Inc.*, No. 04-1235, 2007 WL 2043184 (E.D. Pa. July 12, 2007); *Bouriez v. Carnegie Mellon Univ.*, No. 02-2104, 2005 WL 2106582,* 9 (W.D. Pa. Aug. 26, 2005); *Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc.*, 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." *Thimons v. PNC Bank, NA*, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." *Fireman's Ins. Co. of Newark NJ v. DuFresne*, 676 F.2d 965, 968 (3d Cir. 1982), *see Sunshine Books, Ltd. v. Temple Univ.*, 697 F.2d 90, 96 (3d Cir. 1982)." [A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." *Lockhart v. Hoenstine*, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory

allegations or suspicions." *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985) (citing *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981)).

## IV.   <u>DISCUSSION</u>

As noted above, Hagan's remaining claims against Dr. Dolphin are for alleged deliberate indifference to his serious medical needs, in violation of the Eighth Amendment, as well as a claim for First Amendment retaliation.   Dr. Dolphin has moved for summary judgment with respect to each of these claims, which are addressed separately below.

### A.   **Eighth Amendment**

Hagan faces an exacting burden in advancing his Eighth Amendment claims against prison officials in their individual capacities.   To sustain such a claim, Hagan must:

> [M]eet two requirements:   (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted).   In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* "Deliberate indifference" is a subjective standard under *Farmer*-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.
>
> *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001).

14

These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care.  In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  To establish a violation of his constitutional right to adequate medical care in a prison setting, Hagan is required to point to evidence that demonstrates both (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need.  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain."  *Estelle*, 429 U.S. at 104.  Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or by "persistent conduct in the face of resultant pain and risk of permanent injury," *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional

violation. *Estelle*, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. *Clark v. Doe*, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference. *See e.g. Brown v. Borough of Chambersburg,* 903 F.2d 274, 278 (3d Cir.1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')". *Gindraw v. Dendler*, 967 F.Supp. 833, 836 (E.D. Pa. 1997). Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; *see, e.g., Ham v. Greer*, 269 F. App'x 149 (3d Cir. 2008); *James v. Dep't of Corrections*, 230 F. App'x 195 (3d. Cir. 2007); *Gillespie v. Hogan*, 182 F. App'x 103 (3d Cir 2006); *Bronson v. White*, No. 05-2150, 2007 WL 3033865 (M.D. Pa. Oct. 15, 2007); *Gindraw v. Dendler*, 967 F.Supp. 833 (E.D. Pa. 1997), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the

outcome of these services.  Instead, courts have defined the precise burden which

an inmate must sustain in order to advance an Eighth Amendment claim against a

healthcare professional premised on allegedly inadequate care, stating that:

> The district court [may] properly dis[miss an] Eighth
> Amendment claim, as it concerned [a care giver],
> because [the] allegations merely amounted to a
> disagreement over the proper course of his treatment and
> thus failed to allege a reckless disregard with respect to
> his . . . care.  The standard for cruel and unusual
> punishment under the Eighth Amendment, established by
> the Supreme Court in *Estelle v. Gamble,* 429 U.S. 97,
> 104 (1976), and its progeny, has two prongs: 1)
> deliberate indifference by prison officials and 2) serious
> medical needs.  "It is well-settled that claims of
> negligence or medical malpractice, without some more
> culpable state of mind, do not constitute 'deliberate
> indifference.' "  "Nor does mere disagreement as to the
> proper medical treatment support a claim of an eighth
> amendment violation." . . . . [The inmate] alleged no
> undue delay in receiving treatment and, as the district
> court noted, the evidence he presented established that he
> received timely care . . . .  Although [an inmate plaintiff]
> may have preferred a different course of treatment, [t]his
> preference alone cannot establish deliberate indifference
> as such second-guessing is not the province of the courts.

*James*, 230 F.App'x. at 197-198 (citations omitted).

In short, in the context of the Eighth Amendment, any attempt to second-

guess the propriety or adequacy of a particular course of treatment is disavowed by

courts since such determinations remain a question of sound professional medical judgment. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

Furthermore, it is well-settled that an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim. *See Taylor v. Norris,* 36 F. App'x 228, 229 (8th Cir. 2002) (deliberate indifference claim failed when it boiled down to a disagreement over recommended treatment for hernias and decision not to schedule a doctor's appointment); *Abdul-Wadood v. Nathan,* 91 F.3d 1023, 1024-35 (7th Cir.1996) (inmate's disagreement with selection of medicine and therapy for sickle cell anemia falls well short of demonstrating deliberate indifference); *Sherrer v. Stephen,* 50 F.3d 496, 497 (8th Cir.1994) (inmate's "desire for a replacement joint instead of fusion surgery is merely a disagreement with the course of medical treatment and does not state a constitutional claim"); *Kayser v. Caspari,* 16 F.3d 280, 281 (8th Cir.1994) (prison provided escalating level of treatment for inmate's ailments over time, and inmate's disagreement with course of medical treatment was insufficient basis for Eighth Amendment violation); *Czajka v. Caspari,* 995 F.2d 870, 871 (8th Cir.1993) (inmate's mere disagreement with doctor's informed decision to delay surgery does not establish Eighth Amendment claim); *Smith v. Marcantonio,* 910 F.2d 500, 502 (8th Cir.1990) (inmate failed to prove deliberate

18

indifference where his complaints represented nothing more than mere disagreement with course of his medical treatment); *Lair v. Oglesby,* 859 F.2d 605, 606 (8th Cir.1988) (disagreement about whether doctor should have prescribed medication does not result in constitutional violation); *Martin v. Sargent,* 780 F.2d 1334, 1339 (8th Cir.1985) (inmate failed to state facts indicating doctor deliberately disregarded his medical problem; inmate's disagreement as to proper medical treatment does not give rise to Eighth Amendment violation).  Therefore, where a dispute in essence entails no more than a disagreement between an inmate and medical professionals over alternate treatment plans, the inmate's complaint will fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference."  *Gindraw v. Dendler*, 967 F.Supp. 833, 836 (E.D. Pa. 1997) (citations omitted).

With these well-settled legal guidelines in mind, the Court finds that Hagan's Eighth Amendment claims fail in this case for lack of support.  Reading Hagan's pleadings and filings in support of his claims, it is clear that he believes that he received next to no meaningful medical care or services between April 2013 and November 2013, but the undisputed factual record paints a very different picture.  Indeed, Hagan's allegations are manifestly incorrect, since although he claims that he received no treatments by a medical professional between July 24, 2013, and November 21, 2013, he was seen and assessed by Dr. Dolphin and

others on multiple occasions, and he was twice placed into the POC, one time for a duration of 10 days.  Eight other times, Hagan was seen by other professionals and paraprofessionals to address his persistent allegations of self-harm.  Furthermore, at Dr. Dolphin's direction, Hagan was transferred to a Mental Health Unit at SCI-Rockview for an additional 10 days, and Hagan was seen by an independent outside psychiatrist who not only assessed Hagan, but who confirmed that in his judgment Dr. Dolphin had rendered appropriate medical care.

What becomes clear when reviewing the medical evidence and contrasting it against the parties' competing briefs, is that Hagan consistently attributed retaliatory animus or indifference to Dr. Dolphin's exercise of professional medical judgment.  Thus, Hagan baldly alleges that Dr. Dolphin deliberately falsified medical records for some nefarious purpose in June 2013 when he erased a reference in an Individualized Treatment Plan to Hagan having a psychotic disorder.  Regardless of whether Hagan believes he should have been diagnosed with such a condition, the medical evidence shows that individuals and teams of professionals – in addition to Dr. Dolphin himself – consistently determined that Hagan had no more than Antisocial Personality Disorder and, for a time, Narcissistic Personality Disorder.  Even those diagnoses seem to have been subject to some question by medical providers, who periodically expressed concern that Hagan was malingering or misrepresenting his own conditions or issues.  Notably,

Hagan has no evidence to support his assertion that he actually suffered from a

psychotic disorder from July 24, 2013, through October 1, 2013.[1]  In any event, the

exercise of medical professional judgment during this time to assess and reconsider

Hagan's mental health needs does not in itself amount to deliberate indifference,

and Hagan fails to point to evidence that would show that these determinations

lacked a medical basis.  Moreover, he does not in any persuasive way demonstrate

that adjustments to his housing or mental health assessments amounted to

---

[1]   It seems that Hagan may simply be attributing too much weight to
notations in his Individualized Treatment Plan that was prepared on or
around April 25, 2013.  (Def. SMF, Ex. D, p. 25.)  Hagan reads that note
to include reference to "treatment objectives and goals to treat Hagan's
psychiatric disorder NOS until April of 2014."  (*Id.*)  Hagan contrasts
this note against the care that he subsequently received, and Dr.
Dolphin's reassessment of his condition during this period, to somehow
demonstrate deliberate indifference.  But as Dr. Dolphin correctly notes,
this Individualized Treatment Plan indicates only that this was an
"anticipated duration of treatment," and that April of 2014 was a
"target date."  (*Id.*)  The evidence cannot reasonably be interpreted to
mean that Dr. Dolphin manipulated or falsified medical records to
prevent Hagan from being treated; the evidence instead shows that
Hagan's condition was reassessed periodically and that his diagnosis
changed after the creation of the Individualized Treatment Plan in
April 2013.  Even reading the record in Hagan's favor, as the Court
must do, Hagan has not persuasively shown that the mere adjustment
of a diagnosis and a treatment plan in the context of regular follow-up
prior to the period of "anticipated duration of treatment" has concluded
would amount to deliberate indifference.  As noted, Hagan has offered
nothing but his own speculation for the assertion that he continued to
suffer from such a mental illness in any event.  The records simply
indicate that although Hagan was initially assessed as having a
psychotic disorder, his diagnosis changed over time in response to the
care and treatment he was receiving from Dr. Dolphin and others.

deliberate indifference – much less that he suffered some adverse health consequences as a result.

Hagan also claims that he was deprived of his medications in late June 2013, and he speculates that this was done because he was filing too much legal paperwork at the time.  Yet, the medical evidence indicates without contradiction by anything other than Hagan's self-interested speculation that Hagan was taken off medication because he was not taking them and because he did not seem to be suffering or otherwise affected by being on them.  Months later, in September, medical professionals noted that Hagan seemed to be stable when off his medication – something that underscores that medical professionals were continuing to monitor and assess Hagan and his mental health needs at this time. This, too, amounts to little more than a disagreement with medical professionals about the appropriate level of medical care and services, and does not support a claim for deliberate indifference.

Hagan's casual disregard for the evidence in this case is further apparent in his argument that he was actually taken off of the Mental Health Roster on July 24, 2013.  In fact, the evidence shows that Hagan remained on the roster through September 5, 2013, at which time he was temporarily downgraded to a "B" classification – which was itself later adjusted upward after Hagan professed to be suffering from suicidal ideation.  Hagan's misinterpretation of his treatment

dovetails with his assertion that medical professionals were somehow making treatment decisions to prevent him from participating in the DOJ visit to SCI-Smithfield in August 2013.  As noted above, Hagan claims that he was removed from the Active Mental Health Roster prior to the DOJ's arrival at the prison, but the evidence shows that he was actually on the roster at the time.  Hagan is simply wrong in claiming that he was prohibited from receiving mental health treatment during this time, since in August and October, Hagan received substantial mental health services when he was evaluated by Dr. Dolphin and the Licensed Psychologist Manager in late August, and when he was moved to a POC for 10 days of observation at the beginning of October.  Furthermore, shortly after this evaluation, Dr. Dolphin personally ordered that Hagan be removed and evaluated at a Mental Health Unit at another correctional facility beginning on October 11, 2013.  This evidence thoroughly discredits Hagan's assertion that he received no mental health care during this time.

To the extent that Hagan is claiming that his continued placement in the RHU somehow resulted in his being subjected to housing conditions that aggravated his mental health issues, even assuming this is arguably true, it does not follow that Dr. Dolphin was deliberately indifferent to his needs at this time. Indeed, the record is not subject to any dispute that during his time in the RHU, Hagan was regularly seen by psychiatric staff and was in fact taken out of the RHU

23

on occasion for more pointed evaluation by mental health professionals.  The Court does not find evidence that would create a triable issue with respect to Hagan's custodial placement, when the record also shows that Hagan continued to receive assessment and treatment at this time from Dr. Dolphin and others.

Hagan at times suggests that his medical and mental health needs were fixed and unchanging, such that any change to his diagnosis or care is somehow evidence of deliberate indifference.  Hagan offers no competent medical support for this view, and it not only belies common sense, but it is belied by the record here.  Even after Hagan had an Individualized Treatment Plan prepared in April of 2013, medical providers who assessed and evaluated him had doubts about whether he was really suffering from any substantially serious mental illness at all. Dr. Dolphin and his colleagues at times questioned whether Hagan was simply malingering, and their concerns in this regard were sometimes borne out, such as when Hagan demonstrated no significant change in his condition whether on or off his medication.  Yet even though there was reason to doubt Hagan's subjective complaints and the initial assessment, Dr. Dolphin continued to assess and reassess Hagan and to provide varying levels of care based upon what medical providers understood in their judgment to be the appropriate course of treatment for Hagan's various complaints.  There is, in the end, no dispute in the record that Hagan received consistent and substantial mental health care in 2013, and the Court finds

insufficient evidence that could allow a factfinder to conclude that in spite of this substantial, consistent and ongoing treatment, Dr. Dolphin or his colleagues were nonetheless indifferent to what Hagan subjectively believed his needs to be.

      **B.**    **First Amendment Retaliation**

Hagan attempts to use some of the same allegations addressed above to support his claim that Dr. Dolphin omitted notations of Hagan's alleged psychotic disorder for purposes of retaliating against him for his exercise of protected First Amendment activity through filing grievances and litigation.  Just as we have found that Hagan's own interpretation of his treatment plan and the mental health services rendered to him could not support a claim for deliberate indifference, we likewise find that Hagan's similar assertions cannot support a claim that Dr. Dolphin's continued treatment of him constituted "adverse action" necessary to support a claim for First Amendment retaliation.

"Retaliation for the exercise of a constitutional right is itself a violation of rights secured by the Constitution actionable under section 1983."  *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990).  In *Allah v. Seiverling*, the Third Circuit Court of Appeals held that, "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right."  229 F.3d at 224-25 (quoting *Thaddeus-X v. Blatter*, 175 F.3d

378, 386 (6th Cir. 1999) (en banc)).  Accordingly, the law of this Circuit is clear that a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges that he was denied.  *Id.* at 225.

A prisoner claiming that prison officials have retaliated against him for exercising his rights under the First Amendment must prove that:   (1) the conduct in which he engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct."  *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002)).  An adverse action is one "sufficient to deter a person of ordinary firmness from exercising his rights."  *Id.* at 10 (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000); *see also Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)). The crucial third element, causation, requires a plaintiff to prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997)).

Once a plaintiff has made a prima facie case, the burden shifts to the defendants to prove by a preponderance of the evidence that they "would have

made the same decision absent the protected conduct for reasons reasonably related to penological interest." *Carter*, 292 F.3d at 158.   When analyzing a retaliation claim, courts are to bear in mind that the task of prison administrators and staff is difficult, and the decisions of prison officials require deference, particularly where prison security is concerned. *Rauser*, 241 F.3d at 334.

Hagan makes much of the alteration of his diagnoses, and the adjustment of his treatment that resulted, as he attempts to fashion a First Amendment retaliation claim.  But this claim is conclusory and unsupported, in that Hagan simply has not shown that Dr. Dolphin was motivated in any way by the fact that Hagan had been filing grievances and lawsuits against corrections staff.  Indeed, Hagan's treatment notes do not even motion Dr. Dolphin being aware of Hagan's litigation activities. Hagan's claim is thus pure speculation.   But even if we accept Hagan's unsupported assertion as having some factual basis, the retaliation claim nonetheless fails for lack of support.  Dr. Dolphin has pointed to unrebutted evidence to show that his treatment of Hagan was based on a careful assessment – and reassessment – of Hagan's symptoms and response to treatment over time.  Dr. Dolphin's own professional assessment and judgment were supported by the independent judgment of other providers, including a licensed psychologist and psychiatrist, who assessed Hagan after Dr. Dolphin referred him for additional mental health monitoring at another correctional facility.   With the record

providing uncontradicted support for Dr. Dolphin's handling of Hagan's mental health needs, and the consistent and appropriate treatment that he provided, it is impossible to embrace Hagan's subjective and speculative assertion that this proper course of treatment was nevertheless retaliatory, and we find that he has entirely failed to support his claim that he suffered from "adverse action" that was taken against him, or that any such medical decisions as were made in this case were motivated at all by Hagan's litigation activity.

In short, we cannot find that the medically appropriate and conscientious mental health treatment provided to Hagan was some constitutionally prohibited "adverse action."  Furthermore, since the undisputed evidence shows that this care and treatment was driven by professional judgments concerning Hagan's needs and was entirely divorced from any constitutionally protected conduct by Hagan, there simply is now showing of a causal relationship between Hagan's medical care, and his petitioning activity. In the absence of any competent proof showing either an adverse action, or a causal link between constitutionally protected conduct and some adverse action, this retaliation claim must fail.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, following a review of the record in this case, the Court finds that Dr. Dolphin is entitled to summary judgment on the remaining

claims against him.   Accordingly, an order will be entered granting Dr. Dolphin's

motion, directing that judgment be entered in his favor, and closing the case.


                    ***/s/ Martin C. Carlson***          
                    Martin C. Carlson
                    United States Magistrate Judge